# UNITED STATES DISTRICT COURT

**FILED**

### EASTERN DISTRICT OF CALIFORNIA

APR 16 2012

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

—oOo—

**UNITED STATES OF AMERICA** ~~SEALED~~

v.

Nicholas RAMIREZ, aka "White Boy Nick"
Ung DUONG
Phat NGUYEN
Marcus DAVIS, aka "Killa"
Anthony YOUNG
Justin NONOGUCHI
Manuel KEITH
Tiffany BROWN
Andre CAWTHORNE, aka "Dre from the Bay"
Michael SMILEY
Anthony PAYTON

**CRIMINAL COMPLAINT**

CASE NUMBER:

2:12 - MJ - . 1 0 2 ____ GGH   1

I, the undersigned complainant, state that the following is true and correct to the best of my knowledge and belief. On or about **the dates set forth below** in **the Counties of Solano, Sacramento**, and elsewhere, in the Eastern District of California, the defendants did the following:

Count One: **Nicholas RAMIREZ, Ung DUONG, Phat NGUYEN, Marcus DAVIS, Tiffany BROWN, Andre CAWTHORNE, Michael SMILEY, and Anthony PAYTON** – participating in a criminal conspiracy to distribute and possess with intent to distribute MDMA, a Schedule I Controlled Substance, between approximately July 1, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Count Two: **Nicholas RAMIREZ and Marcus DAVIS** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about March 25, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Three: **Nicholas RAMIREZ, Marcus DAVIS, and Andre CAWTHORNE** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about August 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

CONTINUED ON NEXT PAGE

Count Four: **Marcus DAVIS** and **Anthony YOUNG** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about September 7, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Five: **Nicholas RAMIREZ, Justin NONOGUCHI,** and **Manuel KEITH** - participating in a criminal conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, between approximately March 1, 2009, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Count Six: **Justin NONOGUCHI** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (415) 747-6356 to facilitate the crime of conspiracy to distribute and possess with intent to distribute marijuana, during an intercepted call with Nicholas RAMIREZ, on or about August 16, 2010, all in violation of 21 U.S.C. § 843(b).

I further state that I am a DEA Special Agent and that this complaint is based on the following facts:

► **PLEASE SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part of this complaint:   **X** _____

Signature of Complainant   **Brian M. Nehring,**
**DEA Special Agent**

Sworn to before me, and signed in my presence
**April 16, 2012**                                    **at**   **Sacramento**        **California**

Date _April 16, 2012_                                          City            State

**Gregory G. Hollows    United States Magistrate**                   **GREGORY G. HOLLOWS**

Name of Judge            Title of Judge                      Signature of Judge

### Affidavit of DEA Special Agent Brian Nehring in Support of Criminal Complaint and Arrest Warrants

I, Brian M. Nehring, being duly sworn, depose and state the following:

### Training and Experience

1.  I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7) and I am empowered by law to conduct investigations and felony arrests. I am a Special Agent of the Drug Enforcement Administration ("DEA"), San Francisco Field Division, and have been so employed since 1991. Prior to becoming a DEA Special Agent, I graduated from the California State University, Sacramento in 1990 with a Bachelors of Science in Criminal Justice. I then completed a four-month DEA Basic Agent School at Quantico, Virginia. I have had numerous assignments since beginning with DEA, including being assigned to the Clandestine Laboratory Enforcement Team from 1997 to 1999, the Oakland Resident Office between 1999 and 2002, and the Mobile Enforcement Team between 2002 and 2004. I have been assigned to the Sacramento Division Office since September of 2004.

2.  I am presently assigned to DEA in Sacramento, California. My duties as a Special Agent involve the investigation of various criminal activities of narcotics traffickers and their associates. In investigating these matters, I have acted as a case agent, undercover agent, contact agent for confidential sources, and have participated previously in the utilization of wire and electronic surveillance. These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and convictions of persons for federal narcotics violations. During my narcotic assignments, I have received numerous hours of training in narcotics enforcement and investigative techniques and have personally participated in several hundred narcotics investigations. In addition, I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers. I have been involved in various types of electronic surveillance, including the consensual monitoring of telephone calls. I have discussed these activities with other law enforcement agents who have knowledge of the distribution and transportation of controlled substances, the laundering and concealing of proceeds from drug trafficking, and the criminal gangs who participate in these illegal activities. I know, based upon my experience, and the experience of other agents and law enforcement officials with whom I have consulted, that drug traffickers and money launderers utilize telephones to facilitate their illegal activities. I have learned through experience and through consulting with other experienced law enforcement officers, that court authorized intercepts of wire communications provide valuable evidence of ongoing narcotics trafficking activities.

3.  As a result of my participation in this investigation, and through review and analysis of information received from various sources, including administrative subpoenas, Grand Jury Subpoenas, reports of other law enforcement agencies, law enforcement investigators, telephone toll records and pen registers, I am familiar with all aspects of this investigation. In addition to my personal knowledge, the statements contained in this Affidavit are based in

part on (1) information provided by the DEA, FBI, Vallejo Police Department, and other law enforcement officials, including oral and written investigative and laboratory reports that I have received directly or indirectly from DEA and other law enforcement officials; (2) information provided by gang specialists and narcotics specialists of the Vallejo Police Department, and other law enforcement agencies; (3) results of physical surveillance conducted by DEA, Vallejo Police Department, and other law enforcement officials, which have been reported to me either directly or indirectly; (4) information provided from confidential sources of information, cooperating defendants, and other sources of information working with DEA, Vallejo Police Department and other law enforcement agencies; (5) a review of telephone toll records, pen register, trap and trace, and subscriber information; (6) information derived from consensually monitored telephone conversations; (7) a review of drivers license and automobile registration records; (8) records from the National Law Enforcement Telecommunications System (NLETS) and the National Crime Information Center (NCIC); (9) my training and experience as a Special Agent with DEA; and, (10) the training and experience of other DEA Agents, FBI Agents, Vallejo Police Department Detectives, and other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

### Scope of Requested Criminal Complaint

4.  This Affidavit is submitted in support of a request for a Criminal Complaint and arrest warrants charging members of the Nicholas RAMIREZ Drug Trafficking Organization ("RAMIREZ DTO") with violations of multiple sections of Title 18 and Tile 21 of the United States Code. Specifically, offenses involving violations of Sections 841, 843, 846 of Title 21, United States Code, including the manufacturing, distribution, and possession with intent to distribute controlled substances, including 3,4 methylenedioxymethamphetamine ("MDMA," popularly known as the drug "ecstasy"), and marijuana and conspiracy and attempt to commit such violations. The specific charges for each defendant are set forth at the conclusion of this Affidavit.

5.  On the basis of the information contained in this Affidavit, my experience and training, and on the basis of other information that I have reviewed and determined to be reliable, I believe there is probable cause to believe that Nicholas RAMIREZ, Tiffany BROWN, and members of the RAMIREZ DTO, committed the following crimes:

    a.  Possession with intent to distribute and distribution of 3,4 methylenedioxymethamphetamine ("MDMA," popularly known as the drug "ecstasy"), and marijuana, in violation of Section 841 of Title 21, United States Code;

    b.  Conspiracy and attempt to possess with intent to distribute and to distribute MDMA and marijuana, in violation of Title 21, United States Code, Sections 841, 846; and

    c.  Use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b).

**6.**     Based upon the facts set forth below, there is probable cause to believe that the following individuals:

    **a.  Nicholas RAMIREZ, aka "White Boy Nick,"**
    **b.  Ung DUONG**
    **c.  Phat NGUYEN**
    **d.  Phat NGUYEN,**
    **e.  Marcus DAVIS, aka "Killa,"**
    **f.  Tiffany BROWN,**
    **g.  Andre CAWTHORNE, aka "Dre from the Bay,"**
    **h.  Michael SMILEY, and**
    **i.  Anthony PAYTON,**

have committed the violations of the criminal statutes set forth above (collectively referred to as the "Subject Offenses"). The specific charges for each defendant are set forth at the conclusion of this Affidavit.

### Confidential Source Information Regarding Nicholas RAMIREZ and His Drug Trafficking Organization Supplying Oklahoma Drug Traffickers

7.     During late 2009 and early 2010, I interviewed a confidential source ("CS-1"). At the time of my interviews, CS-1 was in federal custody facing significant federal prison time after CS-1's arrest in 2008 on drug trafficking charges. At the time of CS-1's arrest, he/she possessed a large amount of MDMA. During my interviews of CS-1, he/she spoke to me in the presence of his/her attorney and the prosecuting Assistant United States Attorney in exchange for possible sentencing reduction on his/her then pending federal charges. No promises about sentencing reduction were made to CS-1 at the time of his/her interviews. CS-1 related the following information about Nicholas RAMIREZ and the RAMIREZ DTO.

8.     CS-1 related that he/she was aware of a large MDMA trafficker in Vallejo known as "White Boy Nick" (Nicholas RAMIREZ) who was a white male in his late-20's, approximately 5-10, with braids and gold teeth, who frequented the Crest neighborhood in Vallejo. CS-1 subsequently identified a photograph of RAMIREZ.

9.     According to CS-1, RAMIREZ was also supplying an individual with MDMA pills and that individual told CS-1 in 2008 that Nicholas RAMIREZ was coming out to Oklahoma to pick up $80,000 that the individual owed RAMIREZ for MDMA. CS-1 said RAMIREZ also routinely traveled to Las Vegas, Atlanta, and Houston to deliver MDMA. CS-1 said RAMIREZ's "guy," (that is, RAMIREZ's right-hand man), was a person living at the corner of Sage Street and Mark Avenue known to CS-1 as "Killa," known to law enforcement as Marcus DAVIS.

## FBI Investigation of the Michael SMILEY Drug Trafficking Organization in Oklahoma City, Oklahoma

10.  During March of 2010, I spoke with FBI Special Agent Todd Keck of the Oklahoma City, Oklahoma FBI Office. Special Agent Keck related to me that Michael SMILEY was the main target of an FBI investigation into MDMA trafficking activities of the Bounty Hunter Blood's Street gang in Oklahoma City.

11.  Special Agent Keck said that Anthony PAYTON was a target under this same case as a supplier to SMILEY. According to Special Agent Keck, SMILEY was the owner/operator of PRESIDENTIAL TRAP HOUSE Records. In addition, a confidential source has made controlled purchases of large amounts of MDMA from SMILEY, and later PAYTON. Special Agent Keck advised me that during February of 2010 a package mailed from California was intercepted en route to SMILEY's mother's residence. That package was intercepted by law enforcement and found to contain 5,000 MDMA pills.

12.  Special Agent Keck received information during February or March of 2010 that a white male adult from California known as "Santa Nick with the Sack" had been frequenting Oklahoma and supposedly supplying SMILEY with MDMA. Based upon CS-1's information, I suspected this person was Nicholas RAMIREZ, aka "White Boy Nick."

13.  Special Agent Keck subsequently informed me during mid-2010 that SMILEY was identified as utilizing cellphone (405) 305-0138 and PAYTON was utilizing cellphone (405) 212-1965. I noted that this telephone numbers were in frequent contact with the wiretapped phones used by Nicholas RAMIREZ, designated in this investigation as **TARGET TELEPHONE 2** and **TARGET TELEPHONE 4**. RAMIREZ used these phones during June and July of 2010.

## March 25, 2010 – UC Purchases MDMA Pills and Cocaine Base from LOTT  - Intercepted Wiretap Calls Reveal MDMA Pills Supplied by Nicholas RAMIREZ and Marcus DAVIS

14.  The first clear indication that RAMIREZ was involved in large-scale MDMA trafficking with others occurred during an undercover purchase of MDMA from Michael LOTT on March 25, 2010. On that day, I ordered approximately 4000 MDMA pills from LOTT and LOTT began contacting multiple MDMA suppliers to see if they could provide the pills on short notice. Ultimately, LOTT was intercepted talking with Narco McFARLAND, Jr. During an intercepted call with McFARLAND Jr., LOTT asked if he could call his "guy" to get 4000 MDMA tablets. LOTT and McFARLAND exchanged multiple phone calls. McFARLAND Jr. ultimately was intercepted giving LOTT the telephone number to the MDMA supplier. McFARLAND referred to him as "White Boy Nick," and told LOTT his number was (707) 712-2132. I later learned that this number belonged to Nicholas RAMIREZ, aka "White Boy Nick" because a court-authorized wiretap was granted for this phone. We designated it as **TARGET TELEPHONE 2** in this investigation.

15.  During subsequent intercepted calls by LOTT over **TARGET TELEPHONE 1** to Nicholas RAMIREZ using **TARGET TELEPHONE 2** at approximately 12:53 p.m. on March 25,

LOTT was intercepted telling RAMIREZ that he (LOTT) needed 4000 MDMA pills for a buyer who was traveling to the area (this was a reference to me acting in an undercover capacity). RAMIREZ told LOTT that he was going to meet his MDMA supplier in Oakland that afternoon and could supply as much MDMA as LOTT's buyer wanted that evening. LOTT told RAMIREZ that he had to give the buyer some MDMA at that time to convince him that the rest of the MDMA would be delivered later in the day. During the intercepted call between LOTT and RAMIREZ over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2,** RAMIREZ told LOTT that "Killa" (Marcus DAVIS) most likely had approximately 500 pills left at his residence. RAMIREZ said he would check with DAVIS.

16.  Subsequent telephone toll records revealed that after RAMIREZ's intercepted comments to LOTT, at approximately 12:54 p.m., the next call **TARGET TELEPHONE 2** made was to a cellphone subscribed in the name of "Mario JOHNSON," and subsequently identified as being utilized by Marcus DAVIS, aka "Killa." After the toll record connection between RAMIREZ and DAVIS, RAMIREZ called LOTT back. During an intercepted call between LOTT and RAMIREZ over **TARGET TELEPHONE 1** and **TARGET TELEPHONE 2,** RAMIREZ told LOTT to go to DAVIS in order to obtain the initial amount of MDMA. RAMIREZ said the MDMA pills were "green Playstations" - meaning green MDMA pills stamped with an icon for the Sony Playstation game console. LOTT told RAMIREZ that they would have to deliver the remaining MDMA pills to me that evening. RAMIREZ agreed to this arrangement.

17.  Surveillance subsequently observed LOTT traveling with his cocaine base supplier (Lawrence Kennedy NELSON) from NELSON's house at 324 Amelia Street directly to the residence of "Mario JOHNSON" at 601 Mark Street, Vallejo, California. At 601 Mark Street, agents observed Marcus DAVIS enter their vehicle and accompany them directly to a Chevron Station in Vallejo, California where LOTT delivered approximately one quarter pound of cocaine base and 600 MDMA pills to me. LOTT indicated that the larger bag contained approximately 500 MDMA tablets which were green Playstation emblem pills.

18.  I paid LOTT $4,460 for the cocaine base and MDMA. LOTT said he would deliver the remaining amount (approximately 3,400 MDMA pills) to me in Sacramento later that evening. Following this initial exchange, agents observed their vehicle proceed directly back to DAVIS's residence. DAVIS was dropped off at the residence.

19.  The DEA Western Regional Laboratory subsequently determined that the substance purchased  contained approximately 137.9 grams of a substance and mixture containing MDMA and methamphetamine.

20.  Following this drug deal, agents monitored intercepted calls between LOTT using **TARGET TELEPHONE 1** and RAMIREZ using **TARGET TELEPHONE 2** throughout the afternoon. For example, on March 25, 2010, at approximately 3:40 p.m., LOTT contacted RAMIREZ in an intercepted call over **TARGET TELEPHONE 2** and asked whether RAMIREZ was going to be able to supply the remaining "35" (3,500 pills). During the intercepted call, RAMIREZ said he was in San Francisco and he would be meeting his source in Oakland to "snatch them motherfuckers" and would be on his way to meet LOTT.

21.  Telephone toll analysis of **TARGET TELEPHONE 2** revealed that the next two telephone calls which **TARGET TELEPHONE 2** made at 3:47 p.m. and 3:48 p.m. were to telephone (510) 705-2191. Toll analysis showed that this was the only the "510" area code number (which corresponds to the area code in the Oakland area) that **TARGET TELEPHONE 2** called during the entire period between 3:00 p.m. and approximately 9:00 p.m. during which RAMIREZ indicated that he was speaking to his supplier in Oakland. According to toll record analysis, at approximately 4:55 p.m., **TARGET TELEPHONE 2** called (510) 705-2191. Immediately following this call, at approximately 4:57 p.m., RAMIREZ was intercepted contacting LOTT from **TARGET TELEPHONE 2** and asking LOTT if he was certain that the buyer still wanted the remaining amount of MDMA pills. LOTT confirmed that he still needed the MDMA pills and reminded RAMIREZ that they would have to go together to Sacramento to deliver the pills. During the intercepted call, RAMIREZ said he was in San Francisco but had arranged to go meet the source. RAMIREZ told LOTT that his supplier was stressing him out and wanted the money for the drugs back the same day. RAMIREZ also told LOTT that he was meeting the source in Oakland before coming to meet LOTT. At approximately 5:16 p.m. on March 25, 2010, **TARGET TELEPHONE 2** received an incoming call from (510) 705-2191. At approximately 5:33 p.m., LOTT used **TARGET TELEPHONE 1** to contact RAMIREZ over **TARGET TELEPHONE 2** in an intercepted call. During the intercepted call, RAMIREZ confirmed that the pills he would be delivering to LOTT would be blue and green "Playstations" - meaning blue and green MDMA pills stamped with the logo of Sony Playstation. RAMIREZ also said the pills contained a few yellow "PL" emblem pills.

22.  At approximately 5:45 p.m. and again at 6:00 p.m., **TARGET TELEPHONE 2** received incoming calls from (510) 705-2191. At approximately 6:10 p.m., RAMIREZ used **TARGET TELEPHONE 2** to contact LOTT over **TARGET TELEPHONE 1** in an intercepted call. During the intercepted call, RAMIREZ said he was just leaving the Oakland area on his way to meet LOTT in Vallejo with the pills. Approximately thirty minutes later, surveillance agents observed RAMIREZ arrive at the Vallejo location described by LOTT (Bruce THURMON's residence) during an intercepted call. Agents observed LOTT pick up RAMIREZ in his vehicle. LOTT and RAMIREZ then drove to Sacramento.

23.  According to toll records, at approximately 7:53 p.m., **TARGET TELEPHONE 2** contacted telephone (510) 705-2191. At approximately 7:55 p.m., agents observed RAMIREZ and LOTT exit the freeway in Sacramento heading toward the agreed-upon location for the drug deal with me acting as the UC (a Home Depot located near the intersection of Highway 50 and Power Inn Road). As the vehicle approached my location, I observed RAMIREZ park his vehicle near my vehicle. RAMIREZ exited the driver's side, opened the hood, and removed a bag from the engine compartment. RAMIREZ handed the bag to LOTT. LOTT then walked over to me and gave me the bag. I subsequently determined that the bag contained approximately 3,400 MDMA tablets. After LOTT handed me the bag, I provided LOTT with $9,980. Consistent with RAMIREZ's intercepted description of the pills, the pills that LOTT sold me consisted of 3,000 blue and green MDMA pills stamped with a "Playstation" logo and 400 yellow pills bearing a "PL" emblem.

24. Following this drug deal, LOTT returned to RAMIREZ's vehicle and they left. According to toll records, at approximately 8:00 p.m., **TARGET TELEPHONE 2** received an incoming telephone call from (510) 705-2191. Surveillance agents followed LOTT and RAMIREZ directly back from Sacramento to Vallejo where they parked at the residence of DAVIS at 601 Mark Street.

25. The DEA Western Regional Laboratory subsequently determined the substance purchased contained approximately 774.6 grams of a substance and mixture containing MDMA and methamphetamine.

26. Based upon the content of the intercepted calls between LOTT and RAMIREZ (described above) and the timing and pattern of calls from toll records of **TARGET TELEPHONE 2**, I believe that RAMIREZ was contacting his source of supply for MDMA at cellular telephone (510) 705-2191. This person was subsequently identified as **Phat NGUYEN**, the subscriber of this telephone. As described below, RAMIREZ was later intercepted arranging to purchase MDMA from NGUYEN and was observed obtaining MDMA from NGUYEN which was later located during more than one seizure.

### Initial Intelligence Regarding Nicholas RAMIREZ's MDMA Suppliers Ung DUONG and Phat NGUYEN and Their Connection to Indicted MDMA Drug Trafficker David CHONG

27. Following the termination of wiretapped intercepts of Michael LOTT over **TARGET TELEPHONE 1** in April of 2010, I examined pen register tolls from **TARGET TELEPHONE 2**, used by RAMIREZ, as well as its successor telephone, **TARGET TELEPHONE 4**, which RAMIREZ obtained in July of 2010. I observed that during this time period, RAMIREZ's telephones continued to be high-frequency contact with a cellphone number subscribed to **Phat NGUYEN**, the individual believed to have provided RAMIREZ with the MDMA tablets on March 25, 2010, which RAMIREZ supplied to LOTT and which I purchased on that same date.

28. I examined NGUYEN's criminal history and learned the following:

   a. On or about February 7, 1992, NGUYEN was convicted of two counts of misdemeanor Burglary and was sentenced to 36 months probation and 180 days jail;

   b. On or about September 9, 1997, NGUYEN was convicted of misdemeanor Tampering with a Vehicle;

   c. On or about November 4, 1997, NGUYEN was convicted of Vehicle Theft, a felony, and was sentenced to 16 months prison;

   d. On or about June 29, 1999, NGUYEN was convicted of Evading a Police Officer: Disregard Safety, a felony, and sentenced to 24 months prison.

29. I also noticed that **TARGET TELEPHONE 2** and **TARGET TELEPHONE 4** were also in high frequency contact with cellular telephone (510) 896-0124 which is a T-Mobile phone subscribed in the name of "Ung DUONG" with no listed address. I had previously received intelligence (described below) regarding the suspected MDMA trafficking activities of Ung DUONG.

30. During 2008 and 2009, I participated in a Title III investigation of the MDMA trafficking activities of David CHONG of Alameda, California, who was subsequently indicted in the Eastern District of California for conspiracy to supply Keit TRAN, a Sacramento-based Asian gang member, with 10,000-pill quantities of MDMA. During the course of this investigation, on a date when agents determined through intercepts that TRAN was sending a courier to deliver money to CHONG in Alameda, which was to be utilized by CHONG to obtain more MDMA, agents observed an individual believed to be Phat NGUYEN meet with CHONG immediately following the money delivery which appeared consistent with a source of supply or partner arriving to pick up the money. During the exchange, NGUYEN was driving a gold Lexus registered to his girlfriend Kimaly LUONG at their mutual address (E. 31st Street, Oakland, California). Intercepts revealed that CHONG delivered at least 10,000 MDMA tablets to him within two days of this delivery.

31. During subsequent proffer interviews conducted with a cooperating defendant ("CD") during early 2010, CD told me that CHONG had revealed to him/her during 2008 that CHONG had two MDMA sources of supply, one of whom was an individual named "Ung," subsequently identified as Ung DUONG. The CD also revealed that CHONG had admitted that he had gambled away a very large amount of drug proceeds owed to DUONG and that he feared DUONG was going to have him murdered, because DUONG was a violent person. As a result, CHONG fled Northern California and relocated to San Diego. DEA Special Agents ultimately found and arrested CHONG in San Diego in January of 2010.

32. I subsequently reviewed tolls of the identified telephone of CHONG during the 2008 time period when he was being intercepted over the line with TRAN and during that time period CHONG's telephone was in repeated contact with a cellular telephone subscribed in the name of Ung DUONG at 4774 Stonewood Drive, Fairfield, California.

33. I examined DUONG's criminal history and noted the following:

    a. On or about October 25, 1991, DUONG was arrested for Preventing/Dissuading a Witness by Threat or Force. On or about November 12, 1991, DUONG received a misdemeanor conviction for these charges and was sentenced to 120 days jail and 36 months probation;

    b. On or about April 15, 1996, DUONG was arrested for Possession of a Controlled Substance. DUONG received diversion for this charge;

    c. On or about June 18, 1997, DUONG was arrested for Possession of a Controlled Substance. DUONG received diversion for this charge;

d. On or about November 19, 1998, DUONG was arrested for Possession of Marijuana for Sale and six separate counts of Transportation/Sales of a Controlled Substance. On or about December 28, 1998, DUONG was convicted of two counts of Transportation/Sales of a Controlled Substance, a felony, and was sentenced to 5 years probation and 180 days jail;

e. On or about March 29, 2002, DUONG was arrested for Possession of a Controlled Substance and Possession of Marijuana. On or about April 2, 2001, DUONG received a probation violation in lieu on new charges.

## 2009 - State Wire Tap Leads to Arrest of Louie DUONG and Seizure of 35,000 MDMA Pills

34. I subsequently learned that in May of 2009, the San Francisco BNE Office, in conjunction with the Central Contra Costa County Narcotics Task Force, obtained and initiated a court – approved wiretap order authorized by a Contra Costa County Superior Court Judge for the cellular telephone of a suspected MDMA trafficker (referred here as "Contra Costa Target."). This Contra Costa Target's had contact with the telephone of Michael LOTT and Marico WHITEMON. After commencement of the state wiretap, in July of 2009, the Contra Costa Target was intercepted having drug-related calls with more than one suspected MDMA supplier. Agents subsequently conducted surveillance of the Contra Costa County Target in July 2009, When the Contra Costa Target indicated he was going to meet one of his sources of supply in Oakland, and obtain MDMA, surveillance tentatively identified the Contra Costa Target's MDMA source as Louie DUONG, the brother of Ung DUONG. Shortly thereafter, the Contra Costa County Target was arrested in possession of 2,000 MDMA tablets on state charges and the state wire interception was discontinued.

35. I spoke with BNE Special Agent Tim Jung, the case agent for this investigation. Special Agent Jung told me that a state search warrant was obtained and executed on July 23, 2009, at 697 Sycamore Street, Oakland, California, which was Louie DUONG's listed residence in Oakland. At the time the search warrant was executed, officers located Louie DUONG and Vincent DUONG at the residence along with their mother, Annie DUONG, the owner of the home. Agents located approximately 35,000 MDMA pills in the basement of the home along with over $100,000 in U.S. currency and several firearms. Some suspected MDMA pills were also located in a vehicle outside along with indicia in the name of Ung DUONG.

36. Special Jung told me that a state search warrant was obtained for Ung DUONG's residence at 4774 Stonewood Drive, Fairfield, California, but Ung DUONG was not present when officers executed the search warrant. They did, however, speak to his wife, Yuni THOLMER. She told officers that Ung DUONG resided at the home. No contraband was located. Special Agent Jung informed me that despite arresting the Contra Costa County Target, Louie DUONG and Vincent DUONG, all three individuals were subsequently released and no charges were filed with the District Attorney's Office because another state wiretap was initiated for a different MDMA supplier linked to the Contra Costa County Target. That supplier was pursued and, therefore, the intercepts involving Louie DUONG

could not be revealed during 2009 and 2010. Special Agent Jung informed me that state possession for sale charges were subsequently filed against Louie DUONG. Louie DUONG was arrested by state law enforcement officials in 2011.

### Wire Intercepts of RAMIREZ's TARGET TELEPHONE 3 Commence on July 23, 2010

37.  DEA was authorized to intercept the wire communications of RAMIREZ over **TARGET TELEPHONE 3** pursuant to an Order signed on July 21, 2010, by United States District Judge Morrison C. England, Jr., Eastern District of California. Upon initiation of interception over **TARGET TELEPHONE 3** on July 23, 2010, it became immediately apparent that RAMIREZ, who was in Las Vegas at the time and didn't return to California for several days, was still involved in his drug distribution activities but was contacting his sources of supply on **TARGET TELEPHONE 4** (a Metro PCS Telephone subscribed in a fictitious name and address) and directing customers to **TARGET TELEPHONE 4**.

38.  On July 27, 2010, RAMIREZ was intercepted talking to Anthony Therrill YOUNG using telephone (707) 853-5714, which is subscribed in YOUNG's name. This telephone was subsequently seized from YOUNG on September 7, 2010, during a search warrant in which approximately 11,000 MDMA pills were seized from a residence in Vallejo which he was occupying with his cousin, Marcus DAVIS (described below). During the intercepted call on July 27, 2010, YOUNG said he would call RAMIREZ "on the Metro," believed to be a reference to **TARGET TELEPHONE 4** which tolls showed YOUNG's telephone subsequently contacting.

39.  Inquiries with the California Department of Justice (DOJ) revealed that Anthony Therrill YOUNG, in 2007, sustained a felony conviction in Solano County for Grand Theft from Person, resulting in 3 years probation and 180 days jail.

### August 4, 2010 - RAMIREZ Travels to Oklahoma to see Michael SMILEY – RAMIREZ's Girlfriend, Tiffany BROWN, Mails Packages of Suspected Drugs on RAMIREZ's Behalf

40.  During August of 2010, pen register data for **TARGET TELEPHONE 4**, there were numerous repeated contacts between this telephone and Michael SMILEY's telephone (405) 308-0138 between July 31, 2010, and August 5, 2010. During intercepted calls over **TARGET TELEPHONE 3** during this same time period, RAMIREZ was intercepted telling at least three people who he told he was going to be traveling to Oklahoma and/or Oklahoma City within a few days.

41.  On August 4, 2010, at approximately 3:45 p.m., RAMIREZ was intercepted over **TARGET TELEPHONE 3** calling his girlfriend Tiffany BROWN. Cell site information for this phone showed that RAMIREZ telephone was located either at or within close proximity to the San Francisco International Airport. During this call, RAMIREZ asked his girlfriend if she "had taken care of the first one," to which she stated that she had but that she was looking for a

place to "take care of the second one." A short time later, the pen register on **TARGET TELEPHONE 4** showed several contacts with SMILEY's telephone.

42. At approximately 4:00 p.m. on August 4, 2010, RAMIREZ was intercepted over **TARGET TELEPHONE 3** telling an older female whom he referred to as "mom" that he had to hang up because he was about to board his plane. Agents noted that RAMIREZ had been intercepted on August 1, 2010, speaking to Southwest Airlines during which he had attempted to change a pre-paid ticket for a trip to Oklahoma City, Oklahoma.

43. I believe that the conversation RAMIREZ had with BROWN related to him inquiring if she had mailed packages containing MDMA that he had given her prior to boarding the plane. Previous intelligence had indicated that it was RAMIREZ's modus operandi to mail packages containing MDMA to other states and to fly there to receive them. This investigation would subsequently confirm this was, in fact, RAMIREZ's practice.

44. I subsequently contacted FBI Special Agent Keck in Oklahoma to relay this information. On the evening of August 4, 2010, surveillance agents established surveillance at the Oklahoma City Airport. At approximately 11:00 p.m. on the evening of August 4, 2010, they observed RAMIREZ depart a Southwest flight. They followed him to the exit of the terminal where he got into a cab. Surveillance agents followed this cab directly to the identified residence of Michael SMILEY. Agents observed RAMIREZ exit the cab and apparently enter the residence.

45. On August 5, 2010, at approximately 10:55 a.m., RAMIREZ was intercepted over **TARGET TELEPHONE 3** receiving a call from Tiffany BROWN. BROWN asked RAMIREZ if "everything was cool" and RAMIREZ said that it wasn't, that "the second one is alright" but the "first one isn't here." BROWN told RAMIREZ that it was alright because "they had until 1:00 p.m." RAMIREZ told her it was almost 1:00 p.m. where he was located at that time. I believe based upon the content and timing of all the calls that RAMIREZ had arranged with BROWN to mail the packages containing MDMA to Oklahoma City shortly before his flight left and that RAMIREZ had received the first package and was waiting for the second package to be delivered. The pen register on **TARGET TELEPHONE 4** revealed that this telephone had contact with SMILEY's phone immediately prior to the call with BROWN and shortly thereafter as well. During subsequent intercepted calls with BROWN (following evident text messages) no further mention was made of the packages, leading agents to believe the second package had arrived.

46. On August 6, 2010, RAMIREZ was intercepted calling Tiffany BROWN repeatedly between 10:30 a.m. and 11:15 a.m. and informing her that he had arrived at the Oakland Airport and giving her directions on how to pick him up.

47. On August 10, 2010, at approximately 12:09 p.m., RAMIREZ contacted Tiffany BROWN. RAMIREZ asked her to stop at the bank for him. BROWN asked how much to get out and RAMIREZ said "four dollars." BROWN agreed. At approximately 1:15 p.m., RAMIREZ called BROWN again and asked her to "check your thing to see if it's forty-five fifty."

BROWN asked if it was more and then said, no, she had checked and it was "five dollars."
RAMIREZ told BROWN to check again today.

48. On the same day (August 10, 2010), DEA began court-authorized interception of RAMIREZ
using **TARGET TELEPHONE 4**. RAMIREZ was intercepted calling his suspected
MDMA customer, Michael SMILEY, in Oklahoma. RAMIREZ asked SMILEY if he was
almost done with it all and SMILEY indicated it would be done in a second. RAMIREZ told
SMILEY he would be getting more the following day and would get it out to SMILEY. I
believe that the two calls with BROWN over **TARGET TELEPHONE 3** related to drug
money being placed in her account on RAMIREZ behalf, most likely by SMILEY who was
in the process of distributing MDMA supplied to him by RAMIREZ on August 5, 2010 (see
above), especially in light of the intercepted call between the two on **TARGET
TELEPHONE 4** on August 10, 2010, described below.

### RAMIREZ's Wiretapped Communications Reveal RAMIREZ Soliciting Ung DUONG, Phat NGUYEN and Marcus DAVIS for MDMA Pills to Send to Michael SMILEY in Oklahoma

49. On August 10, 2010, RAMIREZ made a call over **TARGET TELEPHONE 4** to Ung
DUONG at (510) 869-0124. During this call, RAMIREZ asked DUONG, "What's up?"
DUONG responded, "It should be here by six," and "it's on it's way and will be here by six."
RAMIREZ acknowledged and said "alright, yeah."

50. Within three minutes of this call with DUONG, RAMIREZ placed an intercepted call to Phat
NGUYEN at (510) 705-2191. During this intercepted call, RAMIREZ asked NGUYEN if
there was anything around. NGUYEN said nothing, that he had called the dude to see what
was taking so long, and that he didn't know what was happening there and didn't have any
"color."

51. Within an hour of the call with NGUYEN, RAMIREZ received an incoming intercepted call
from Michael SMILEY in Oklahoma. During this intercepted call, SMILEY asked
RAMIREZ if he was ready all the way to go and RAMIREZ told SMILEY that he would be
getting his hands on some more in just a second but that his sources kept "bullshitting" him.
RAMIREZ told SMILEY he would call him as soon as he got it and was pretty sure he would
definitely have it the following day. I noted that RAMIREZ attempted unsuccessfully to
contact DUONG again just prior to the call with SMILEY.

52. Shortly after this call, RAMIREZ received three successive incoming calls from Marcus
DAVIS from cellular telephone (917) 468-9573, subscribed in the name of Tony Montana.
During these three intercepted calls from DAVIS on August 10, 2010, RAMIREZ asked
DAVIS if he ever "got in pocket," and DAVIS told RAMIREZ that the source never called
him back.

## August 11, 2010 – Drug-Related Intercepts of Nicholas RAMIREZ, Ung DUONG and Michael SMILEY over TARGET TELEPHONE 4 and Surveillance of Drug Deal

53.  On August 11, 2010, at approximately 12:25 p.m., RAMIREZ received an incoming SMS text message from SMILEY. RAMIREZ then placed a call to DUONG at approximately 12:57 p.m. and RAMIREZ asked DUONG where he was located. DUONG told RAMIREZ he was at his house and agreed to meet RAMIREZ once DUONG got into town shortly. At approximately 1:32 p.m., DUONG called RAMIREZ to let him know that he was in Oakland. RAMIREZ said he was taking a shower and needed about a half-hour. DUONG told RAMIREZ to make it quick.

54.  At approximately 1:56 p.m., DUONG called RAMIREZ and told him to meet at the Pac'N Save (Oakland, California). RAMIREZ asked DUONG if his was the "same spot as last time" and DUONG indicated that it was. RAMIREZ told DUONG to give him about 20 minutes.

55.  Shortly after this call, agents observed RAMIREZ driving his white Honda away from his girlfriend's apartment in Dublin, California. At 2:37 p.m., RAMIREZ contacted SMILEY in Oklahoma and told him that he would have to call him back when he got home and added that he just grabbed them right now and didn't want to talk while driving and until he finally had "the shit" in his hands.

56.  At approximately 2:44 p.m., RAMIREZ called DUONG and told him that he was arriving. DUONG said he had left and was coming back. Shortly thereafter, agents observed RAMIREZ arrive in the Pak'N Save lot, park, and enter a white Audi A6 with paper dealer plates. This vehicle was subsequently found to be registered to DUONG. Agents also were later able to visually identify the driver of the Audi as Ung DUONG.

57.  A few minutes later, agents observed RAMIREZ exiting DUONG's Audi. At this time, RAMIREZ was observed clutching an empty white plastic bag. I believe RAMIREZ delivered the money for MDMA to DUONG at this time. RAMIREZ then re-entered his vehicle and was followed by agents to a public market in Emeryville, California.

58.  At approximately 3:25 p.m., DUONG called RAMIREZ and told him that it would be 20 minutes and RAMIREZ asked if they would meet in "the same spot." DUONG said they would meet at East 14th Street near "the lake." Surveillance agents then followed RAMIREZ from Emeryville to the area around East 14th Street in downtown Oakland.

59.  At approximately 3:48 p.m., RAMIREZ made an intercepted call to DUONG and said he was at the Burger King on E. 14th. DUONG told RAMIREZ that he was on 16th and RAMIREZ should go to 2nd Avenue, a short distance away. Agents followed RAMIREZ but lost sight of him a short distance away.

60.  At approximately 3:54 p.m. RAMIREZ placed a call to DUONG and asked him if he wanted him to pull into the lot and DUONG said yes. I believe the exchange of MDMA took place at

this time. Within minutes of this exchange, agents located DUONG's white Audi A6 parked in the parking lot of a Vietnamese Restaurant in this same area and subsequently observed DUONG come out of the restaurant and re-enter his Audi and drive away.

## August 12, 2010 – Surveillance of Suspected MDMA Shipment through UPS Conducted by RAMIREZ and Tiffany BROWN

61. On August 12, 2010, at approximately 11:46 a.m.., RAMIREZ received a call from Michael SMILEY in Oklahoma. RAMIREZ asked SMILEY if he needed "another info" because RAMIREZ "was doing 2 separate ones." SMILEY told RAMIREZ that he would get one real quick and then call him RAMIREZ back. RAMIREZ asked SMILEY if he wanted RAMIREZ to shoot "two" SMILEY's way and then do the other two next week. SMILEY told RAMIREZ no. SMILEY said that he would get it right now.

62. At approximately 11:58 a.m., RAMIREZ called a female believed to be his cousin, Maria MARTINEZ, at (408) 903-0725. RAMIREZ asked MARTINEZ if she could do him RAMIREZ a favor and "go get that today." MARTINEZ agreed and told RAMIREZ that she was watching the kids right now so she would have to wait until one of them get home. RAMIREZ asked MARTINEZ how much it was and asked if it was "49." MARTINEZ told RAMIREZ yes but that she was overdrawn 300, so MARTINEZ was waiting on her unemployment check. RAMIREZ told the MARTINEZ that it was cool and not to worry about it. RAMIREZ told MARTINEZ to take out "45." MARTINEZ agreed. RAMIREZ told MARTINEZ to call him after she did it later on today. MARTINEZ agreed to this.

63. Based upon the timing and content of this call, as well as prior calls over **TARGET TELEPHONE 3**, and subsequent repeated calls over **TARGET TELEPHONE 4** on August 17, 18, and 20, 2010, with similar or identical content in and around the times when RAMIREZ was conducting drug transactions with Michael SMILEY and preparing to ship MDMA, I believe that RAMIREZ was utilizing MARTINEZ to receive drug money deposits and payments in her account from SMILEY on RAMIREZ's behalf and that RAMIREZ was meeting with her and picking up this drug money.

64. Based upon these calls, agents conducted surveillance of the Dublin apartment complex where RAMIREZ was living at the time. Agents observed RAMIREZ's girlfriend, Tiffany Shalia BROWN, driving away from the complex in a maroon 2002 Mercedes Benz, California license plate number 5HQJ151, shortly thereafter. This Mercedes is registered to BROWN's suspected grandparents at 200 Hearthstone Circle, Oakley, California, which was also BROWN's listed resident address with DMV. Inquiries with the California Department of Justice (DOJ) revealed that BROWN was arrested at this complex in May of 2010 for domestic violence. In the domestic violence incident, RAMIREZ is listed as the victim. In addition, the location of domestic violence arrest was Apartment 281 within the complex at 5501 Demarcus Boulevard, Dublin, California.

65. Agents followed BROWN down the street to a nearby International House of Pancakes ("IHOP") Restaurant where a surveillance agent observed her meeting with RAMIREZ in the

parking lot. Surveillance then observed RAMIREZ giving BROWN two large gift-wrapped packages. BROWN placed the packages into her maroon Mercedes Benz and drove away.

66. Agents followed BROWN from Dublin as she drove to Foster City, California. In Foster City, agents observed BROWN drive randomly through residential neighborhoods and stop briefly in front of homes before driving off and ultimately arriving at a UPS Store.

67. As BROWN was driving through Foster City and prior to arriving at the UPS Store, RAMIREZ was intercepted exchanging a series of calls with BROWN during which RAMIREZ indicated he was texting her the shipping addresses for more than one package and during which he discussed the zip code for a package destined for New York.

68. Surveillance subsequently observed BROWN carrying one of the gift wrapped packages into the UPS store and giving it to a clerk to mail to an address in New York. Detective Badour entered the store and verified that BROWN provided a false name and sender shipping address. The street address appeared to match one of the streets that surveillance had earlier observed BROWN her driving down before heading to the UPS store.

69. Surveillance then followed BROWN directly to another UPS Store, also in Foster City. At the second UPS store, an agent observed BROWN carry in the other gift-wrapped package and give the package to a clerk. The agent entered the store and subsequently verified that BROWN provided an additional false name and another apparent false shipping address in Foster City. The destination city was an address in Oklahoma.

70. Because BROWN dropped these packages off just prior to the cut-off overnight shipping time, agents were unable to obtain a narcotics detection canine in time to examine the packages before they were shipped out. Nevertheless, based upon the subsequent investigative events detailed below, I believe RAMIREZ and BROWN shipped MDMA supplied by DUONG the previous day to New York and Oklahoma on August 12, 2010.

71. On August 13, 2010, Michael SMILEY and RAMIREZ exchanged a series of intercepted calls during which they discussed the fact that the packages had not yet arrived and tracking the whereabouts of the packages.

72. On August 14, 2010, at approximately 10:19 a.m., RAMIREZ received an intercepted call from SMILEY. SMILEY told RAMIREZ that his "guy" had gone to pick up the package. At approximately 10:46 a.m., RAMIREZ placed a call to SMILEY and asked SMILEY if everything was good. SMILEY responded that his guy had picked it up and that he but SMILEY was going to call this person to see where he was at because he had not pulled up yet. RAMIREZ acknowledged this.

73. At approximately 12:54 p.m., RAMIREZ received a call from Anthony PAYTON using (405) 212-1965. PAYTON told RAMIREZ that SMILEY was not there [undisclosed location]. RAMIREZ said SMILEY pulled a fast one on him [RAMIREZ] and asked where SMILEY was. PAYTON answered that he did not know. PAYTON claimed that SMILEY

left with another person. PAYTON said he would let RAMIREZ know as soon as SMILEY contacted him. RAMIREZ agreed to this.

74. At approximately 1:24 p.m., RAMIREZ placed an intercepted call to SMILEY and asked if SMILEY would be done with it by Monday or Tuesday. SMILEY confirmed that he would. RAMIREZ said that next weekend he [RAMIREZ] had to take care of some stuff for about two days. SMILEY acknowledged this. RAMIREZ said he wanted to get some more for SMILEY by Friday [August 20, 2010]. SMILEY agreed to this.

75. In this series of intercepted calls, I believe that RAMIREZ sent MDMA to SMILEY in Oklahoma. SMILEY sent an individual to obtain the package. SMILEY then confirmed for RAMIREZ that SMILEY had obtained the drugs and would complete distribution of the drugs by Monday or Tuesday of the following week (this intercepted call took place on August 14, 2010, which was a Tuesday).

### August 16, 2010 - Intercepted Calls and Surveillance Demonstrate Andre CAWTHORNE Requests 2000 MDMA Pills from RAMIREZ – RAMIREZ then Obtains the 2000 MDMA Pills from Marcus DAVIS

76. On August 16, 2010, at approximately 2:25 p.m., RAMIREZ received an intercepted call from (323) 921-9211, subscribed in the name of Andre CAWTHORNE, a known previously convicted drug trafficker and bank robber. CAWTHORNE's cellphone had repeated high-frequency contacts with RAMIREZ over **TARGET TELEPHONE 2** and **TARGET TELEPHONE 3**. CAWTHORNE's same cellphone also previously had high frequency contacts with the cellphone utilized by Hanny BEHKIT, another Vallejo-based MDMA trafficker convicted and sentenced in the Eastern District of California for Distribution of MDMA and marijuana.

77. I was informed that CAWTHORNE was previously identified as a member of the Romper Room Bank Robbery Crew which eventually evolved into THIZZ ENTERTAINMENT, of which Michael LOTT is the supposed co-CEO.

78. Inquiries with NCIC regarding CAWTHORNE revealed the following criminal history.

   a. On or about July 21, 1993, CAWTHORNE was arrested for Bank Robbery. On or about February 5, 1994, CAWTHORNE was convicted in the Eastern District of California and was sentenced to 97 months prison and 60 months probation.

79. During the initial intercepted call between RAMIREZ and CAWTHORNE on August 16, 2010, CAWTHORNE asked about "those little things." RAMIREZ asked how much he needed. CAWTHORNE replied, "Two boats." In my training and experience and in this particular case, the term "boats" refers to a 1000-pill quantities of MDMA. RAMIREZ informed CAWTHORNE that it would be "24" [$2,400 for each boat] and he would find out the flavors. CAWTHORNE said his customer needed them immediately.

80. RAMIREZ then tried to call Phat NGUYEN over the wiretapped phone, but NGUYEN did not answer.

81. At approximately 3:02 p.m. on August 16, 2010, RAMIREZ placed an intercepted call to "Mike" at (707) 315-5055. There is no listed subscriber for this number. During the intercepted call, RAMIREZ told Mike that he needed "two of them" immediately. Mike told RAMIREZ that his source would probably not have anymore until the following day and that they would be "24" [$2400] each. RAMIREZ protested this was too high and that he needed to know the flavor [that is, the color and stamp of the pills].

82. At approximate 3:04 p.m., RAMIREZ placed an intercepted call to Marcus DAVIS and asked if he could get MDMA immediately. DAVIS said he had met a new Asian male source who had previously supplied "Hanny" and that he would call this person to inquire. This reference to "Hanny" is Hanny BEHKIT, a Vallejo-based drug trafficker arrested and convicted on federal MDMA charges in the Eastern District of California. Between 3:15 p.m. and 4:20 p.m. on August 16, RAMIREZ exchanged additional intercepted calls with DAVIS. DAVIS said he was in the process of calling this new Asian source to see about obtaining pills.

83. At approximately 4:27 p.m., RAMIREZ received a call from "Mike" who said he would be getting more [pills] the following day from his source and that he could provide them for "22" [$2,200 for each boat of MDMA pills]. RAMIREZ said he would definitely get more than a couple.

84. At approximately 5:20 p.m., RAMIREZ placed an intercepted call to CAWTHORNE. RAMIREZ told CAWTHORNE that he was still waiting on his guy to call him back.

85. Immediately after the call with CAWTHORNE, RAMIREZ placed an intercepted call to Ung DUONG. This call went to DUONG's voicemail. Between 5:20 p.m. and 6:00 p.m. on August 16, 2010, RAMIREZ attempted to contact DUONG five times. Each attempt was unsuccessful.

86. At 5:35 p.m. on August 16, 2010, RAMIREZ received an intercepted call from Anthony YOUNG utilizing telephone (707) 853-5714. During the intercepted call, RAMIREZ asked YOUNG if he had any MDMA. YOUNG said he had just spoken to his MDMA source and this person would have it the following day. YOUNG asked RAMIREZ if he was trying to get the MDMA for "Dre from the Bay." The nickname "Dre from the Bay," is the known moniker for Andre CAWTHORNE. RAMIREZ denied he was trying to get MDMA pills for "Dre from the Bay." YOUNG said he knew that CAWTHORNE would be coming to RAMIREZ to get the "two," that is, two boats, or 2000 MDMA pills.

87. Surveillance subsequently followed RAMIREZ from Vallejo to Richmond. In Richmond, agents observed RAMIREZ conduct a suspected marijuana deal in a public lot before returning to Vallejo.

88.   Between 6:00 p.m. and 8:00 p.m. on August 16, 2010, RAMIREZ, CAWTHORNE, and
      DAVIS exchanged approximately 17 telephone calls. During this series of calls, DAVIS
      advised RAMIREZ that he was going to be meeting the Asian MDMA source at the Teeters
      Sports Bar in Vallejo at 7 p.m. to obtain the MDMA. DAVIS said he would call RAMIREZ
      and tell him RAMIREZ which type of MDMA pills (color and stamp) were available.

89.   Agents subsequently intercepted DAVIS calling RAMIREZ and telling him that they were
      "blue Superman" pills and "green Monkey" pills. RAMIREZ was then intercepted calling
      CAWTHORNE and relaying to CAWTHORNE that "blue Superman" pills and "green
      Monkey" pills were the types of pills available to CAWTHORNE.

90.   Surveillance agents subsequently observed Marcus DAVIS at the Teeter's Sports Bar in
      Vallejo. While DAVIS was observed meeting with his suspected source of supply and
      obtaining the pills, CAWTHORNE was intercepted calling RAMIREZ and telling
      RAMIREZ that the original customer was not answering the telephone but that they could
      meet later or the following day for CAWTHORNE to obtain the pills from RAMIREZ.

91.   A short time later, DAVIS was intercepted contacting RAMIREZ and instructing him to meet
      at a Taco Bell Restaurant across directly across the freeway from the Teeters Sports Bar.
      Agents observed DAVIS and RAMIREZ meet in the Taco Bell lot. During the surveilled
      meeting, agents observed DAVIS give RAMIREZ a large red bag suspected to contain the
      MDMA ordered by CAWTHORNE.

### RAMIREZ, SMILEY and PAYTON Discuss Drug Money Owed for Prior Drug Shipments - RAMIREZ Flys to Atlanta and New York

92.   On August 17, 2010, at approximately 8:22 p.m., RAMIREZ placed an intercepted call to
      Michael SMILEY and said he was checking to see if his "folk" was going to talk to
      RAMIREZ. RAMIREZ told SMILEY he might need him to drop some of "that" tomorrow
      and he would call SMILEY back tonight because he was about to get a haircut.

93.   On August 18, 2010, at approximately 10:08 a.m., RAMIREZ called suspected cousin Maria
      MARTINEZ at (408) 903-0725. During the intercepted call, RAMIREZ asked MARTINEZ
      if everything was cool. MARTINEZ affirmed. RAMIREZ told MARTINEZ that he would
      have his dude drop some more and asked if it was cool with MARTINEZ, which she
      indicated it was. RAMIREZ told MARTINEZ he would go over to her place on Thursday or
      Friday. MARTINEZ told RAMIREZ she would be going to Hayward the following day so if
      he wanted it, she would bring "it" with her and meet him there or she could come to him after
      she was done in Hayward. RAMIREZ said Hayward would work better for him.

94.   I believe that during this intercepted call, RAMIREZ was arranging to obtain money sent by
      Michael SMILEY to Maria MARTINEZ's account on RAMIREZ's behalf for drugs
      RAMIREZ had previously sent to SMILEY in Oklahoma.

95. At approximately 1:05 p.m. on August 18, 2010, RAMIREZ placed an intercepted call to SMILEY and asked if he got "it" yet. SMILEY told RAMIREZ, "no," and asked if RAMIREZ sent the second one. RAMIREZ told SMILEY he was about to send it.

96. In this intercepted call, I believe RAMIREZ is asking whether SMILEY received a text message with account information for SMILEY to deposit drug money into. In turn, SMILEY is asking RAMIREZ whether RAMIREZ has sent a second package containing drugs to SMILEY in Oklahoma.

97. On August 20, 2010, at approximately 11:06 a.m., RAMIREZ placed an intercepted call to Anthony PAYTON. RAMIREZ told PAYTON that he hoped he didn't have bad news. PAYTON told RAMIREZ no. PAYTON told RAMIREZ that he was "just waiting around this dumb- dumb" and added that he was supposed to "drop some dough." RAMIREZ stated that he had that "shit" sitting there but wasn't going to send it until he [SMILEY] sends "it," believed to mean SMILEY depositing money into RAMIREZ's designated bank account.

98. At approximately 11:13 a.m. on August 20, 2010, RAMIREZ received an intercepted call from SMILEY. RAMIREZ asked SMILEY why he didn't "do the drop" yesterday. SMILEY told RAMIREZ that he had been running around but would do it right now. RAMIREZ asked if he wanted RAMIREZ to send "that shit" the following day or later. SMILEY told RAMIREZ that he would do it on Monday. RAMIREZ agreed to this and told SMILEY to put "four" in each one because he (RAMIREZ) really needed the money. SMILEY agreed to do this.

99.  Based upon intercepted calls of RAMIREZ over **TARGET TELEPHONE 3** which occurred on this same day and during this same time frame, agents learned that RAMIREZ was flying to Atlanta on August 20, 2010. Agents learned that RAMIREZ flew from Atlanta to New York on August 21, 2010. He stayed in New York through August 23, 2010. RAMIREZ was then intercepted saying that he indicated he was going to fly back to California late in the evening.

100. On August 23, 2010, at approximately 2:00 p.m., SMILEY called RAMIREZ and asked him to send SMILEY that "info" right now so SMILEY could do "that." I believe SMILEY is asking RAMIREZ for bank account information to be text messaged to RAMIREZ so that SMILEY can deposit money into RAMIREZ's designated account for drugs previously provided. During the intercepted call, RAMIREZ told SMILEY that he should have been done with that "shit" already. SMILEY said that he would do it right now. RAMIREZ reinforced that he had been broke all weekend and SMILEY acknowledged.

101. On August 24, 2010, at approximately 9:37 a.m., RAMIREZ placed an intercepted call to Phat NGUYEN. During the intercepted call, RAMIREZ referred to NGUYEN as "boss" and asked if there was anything yet. NGUYEN said no because the source had not called NGUYEN yet, so nothing was going on. NGUYEN said that he didn't know what was going on, but would let RAMIREZ know when it did. RAMIREZ told NGUYEN that was a crazy thing because his folks have "hell of them" and added that they just have high prices right

now. NGUYEN then told RAMIREZ that he would call his people to find out what was going on.

102. Following this call, RAMIREZ called several individuals, including Marcus DAVIS, inquiring about the availability and prices for MDMA. RAMIREZ told DAVIS he would want at least three "boats" [3000 MDMA pills] immediately, possibly more depending on the price.

103. At approximately 11:53 a.m. on August 24, 2010, RAMIREZ received an intercepted call from Anthony YOUNG. During the intercepted call, RAMIREZ asked YOUNG what was up with his folks, whether they had little things or not. YOUNG said his MDMA source was out of town until 2 or 3 o'clock that day. RAMIREZ told YOUNG to see if the guy would have some when he came back. YOUNG said okay and then asked why RAMIREZ never answered his phone. RAMIREZ asked when YOUNG had called and YOUNG said he tried calling him yesterday to give him his other number. RAMIREZ explained that this phone had been turned off because he had been on the East Coast. YOUNG said okay and told RAMIREZ that he would call him back.

104. At approximately 5:00 p.m. on August 24, 2010, RAMIREZ received an intercepted call from Marcus DAVIS. DAVIS told RAMIREZ that he had received several "boats" of MDMA pills of different types, including "Maserti," "Dove," and "Superman" pills in different colors. I believe each of these descriptions refers to the particular stamped logos on the MDMA pills DAVIS possessed at the time of this intercepted call. During subsequent intercepted calls from DAVIS, DAVIS informed RAMIREZ that he had also had a large number of "red Playboy," "blue Dolphin," "green 007," and "yellow Pickachu" MDMA pills dropped off as well. RAMIREZ told DAVIS he wanted at least "five" [5000 MDMA pills] all together, and he wanted one of each. RAMIREZ asked DAVIS if they were "23" [$2,300 per 1000-pill quantity] each. DAVIS affirmed this was the price.

105. At approximately 6:46 p.m. on August 24, RAMIREZ placed an intercepted call to Phat NGUYEN. During the intercepted call, RAMIREZ asked NGUYEN if there was anything and NGUYEN said no. NGUYEN told RAMIREZ he didn't know where all his people were. RAMIREZ told NGUYEN he couldn't get a hold of anything. RAMIREZ told NGUYEN his partner had "Maserati," "Pikachus," "Playboys," and "007's," but the price was too high. NGUYEN told RAMIREZ he called his sources and they don't have anything but that NGUYEN would let RAMIREZ know if anything came up. RAMIREZ acknowledged.

106. RAMIREZ subsequently contacted DAVIS and told him he would come to Vallejo the following day to obtain the pills from DAVIS.

### August 25, 2010 - RAMIREZ Obtains MDMA Pills from Marcus DAVIS - Calls to Offer the Pills to Michael SMILEY and Anthony PAYTON

107. On August 25, 2010, at approximately 12:55 p.m., RAMIREZ received an incoming intercepted call from Michael SMILEY. During the intercepted call, RAMIREZ told

SMILEY he was about to go get the MDMA at that moment. Following this call, RAMIREZ then spoke with DAVIS and told him he was on his way to Vallejo to meet him.

108. Surveillance agents subsequently followed RAMIREZ in his white Range Rover from Dublin to Vallejo. In Vallejo, agents observed RAMIREZ traveling to DAVIS's residence at 601 Mark Street in Vallejo. At approximately 1:51 p.m., a few minutes after entering DAVIS's residence, RAMIREZ placed an intercepted call to SMILEY in Oklahoma. RAMIREZ could be heard in the background talking to DAVIS and saying: "what was that, crowns?" RAMIREZ made a whistle sound when he got SMILEY's voicemail. Two minutes later, RAMIREZ placed another intercepted call to SMILEY's phone. RAMIREZ could again be heard in the background talking and saying: "the crowns and the other shit ... what's a cool price to you... I just want to get rid of these motherfuckers, I don't even want to have them." Again, RAMIREZ made a whistle sound.

109. At approximately 1:56 p.m., while still inside DAVIS's residence in Vallejo, RAMIREZ made an outgoing intercepted call to Anthony PAYTON at (405) 212-1965. RAMIREZ asked if they [PAYTON and his co-conspirators] were doing "crowns." PAYTON asked if RAMIREZ was talking about the "Masertis." RAMIREZ said no, he was talking about "crowns" RAMIREZ described the "Masertis" were the little skinny ones [pills] with the Maserti logo stamped on them. PAYTON acknowledged. RAMIREZ said these pills were fat like the "Superman" pills and were big, with the round bottom. RAMIREZ said they were like that but with a crown on them. RAMIREZ said that his friend had some "crowns" right now for about "19" [$1,900 each for 1000-pill quantity] because he was trying to get rid of them all at once. PAYTON asked if the "crowns" were gold colored. RAMIREZ said he could get two of them and send them out so PAYTON could see them. RAMIREZ said that from what he heard these pills were good quality. PAYTON addressed a third party in the background. PAYTON relayed RAMIREZ's message about RAMIREZ's friend having some "crowns."

110. During this same intercepted call, RAMIREZ said that they are just two [boats] of them, one [boat] has 500 "doves" and 500 "crowns." The other [boat] is just a pack of "crowns." RAMIREZ said his friend came up on them and wanted to get rid of them really quick for "19" [$1900] a piece and it was a one-time deal. PAYTON told RAMIREZ he would talk to his friend and get back to RAMIREZ. RAMIREZ asked where they were and said that he could bring PAYTON a couple for PAYTON to test them out. PAYTON answered that they [PAYTON and his co-conspirators] were in Sacramento at that moment.

111. During this same intercepted call on August 25, 2010, PAYTON told RAMIREZ that he had that "Johnny" for RAMIREZ. RAMIREZ acknowledged and asked when PAYTON would be back out here [undisclosed]. PAYTON responded in a little bit. RAMIREZ said that he [RAMIREZ] would get about two or four of them and would go give them to the "little cutty" so by the time they PAYTON got there [undisclosed], they [RAMIREZ's associates] could decide what to do. PAYTON acknowledged.

112. At approximately 2:02 p.m. on August 25, 2010, while RAMIREZ was still inside DAVIS's residence, RAMIREZ called SMILEY and asked him if he ever "fucked with the crowns and

doves." SMILEY asked if they looked dusty or small or just like they pack a lot of heat. RAMIREZ said no, that they were the bigger ones, but he did say that he had the small ones that pack a lot of heat but he [likely a third party] had two extra ones. SMILEY told RAMIREZ not to get those because they were the cheap form and perhaps they were no good. RAMIREZ said he didn't think that they were not good, and that he [third party] mentioned that he had two extra ones and wanted to see if RAMIREZ would take them. RAMIREZ said that he had some "Playboys," "Pickachus," "Masertis," "007's." SMILEY said, "That's what I'm talking about." RAMIREZ said he was sending one of each so the people can chose which one they like the most. SMILEY said they could get the other ones and just mix the shit in. RAMIREZ said that was cool.

113.  Shortly after this intercepted call, surveillance observed RAMIREZ exiting DAVIS's residence carrying a small red box. A surveillance agent observed RAMIREZ opening the hood of his Range Rover and placing the box under the hood in the engine compartment before closing the hood and driving away.

114. I know from my training and experience that drug dealers often place contraband under the hood in the engine compartment of their vehicle to avoid detection by law enforcement while transporting drugs. RAMIREZ then drove directly to his parent's nearby residence at 70 Castellina Circle, American Canyon, California. RAMIREZ entered for less than five minutes before driving away again. RAMIREZ was then followed to a residential street in Vallejo where he was observed meeting with an individual in another vehicle. TFO Robert KNIGHT observed RAMIREZ hand this individual a clear plastic bag which clearly contained a large number of red tablets.

115. At approximately 8:34 p.m., RAMIREZ called PAYTON and stated that his "little friend" said the pills were not like the "Pickachu," they were like the "Superman" pills. PAYTON acknowledged. RAMIREZ said that for 19 [poss. price], to let RAMIREZ know. RAMIREZ said that he was calling PAYTON to see if PAYTON wanted to do something. PAYTON acknowledged and said that guy was cool, but that PAYTON was straight through and that his "burn" was already gone. RAMIREZ acknowledged and asked if he [third party] gave PAYTON that [unspecified]. PAYTON said that he [PAYTON] would not be able to give it to RAMIREZ until tomorrow [Thursday, August 26, 2010]. RAMIREZ agreed and said that he [RAMIREZ] was not there anyway and that RAMIREZ would contact PAYTON. PAYTON agreed and said that he [PAYTON] could give it [poss. product/money] to him [third party]. RAMIREZ agreed. PAYTON said that he owed the third-party money anyway. RAMIREZ acknowledged. PAYTON asked if it was 2 or 3. RAMIREZ answered that it was 2, 2010. PAYTON acknowledged.

## August 26, 2010 – RAMIREZ and BROWN Intercepted Sending Thousands of MDMA Pills and Pounds of Marijuana to New York Through UPS

116. On August 26, 2010, at approximately 8:58 a.m., RAMIREZ made an outgoing call to SMILEY and asked if SMILEY had made that drop yet. SMILEY responded that he would

send it in the next 30 -- RAMIREZ interrupted SMILEY and said that SMILEY had said that for two days and told SMILEY to send RAMIREZ that information. SMILEY agreed.

117. At approximately 11:30 a.m., RAMIREZ called SMILEY and told SMILEY to send that information. SMILEY responded that he was waiting for the text to come in. RAMIREZ acknowledged and said that she [Tiffany] was about to do that [mail out the packages per surveillance] right now. SMILEY acknowledged. At approximately 12:40 p.m., RAMIREZ contacted SMILEY and told him that if SMILEY did not send RAMIREZ the information, then RAMIREZ would not send SMILEY anything [drugs]. SMILEY told RAMIREZ that he had already sent the text and told RAMIREZ to hold on.

118. At approximately 12:53 p.m., RAMIREZ contacted Tiffany BROWN. BROWN told RAMIREZ that she only had time to do "one" and was not going to take a lunch. BROWN further explained that at 3 p.m., she would tell them that she had to leave work and would do the other "one" at 3 p.m. RAMIREZ acknowledged and said that it was okay as long as it [the package containing drugs destined for SMILEY in Oklahoma] left that day.

119. At approximately 3:11 p.m., RAMIREZ contacted SMILEY and asked if SMILEY had put it [poss. money] in the "TiffanB" account and how much. SMILEY confirmed and said that 3,000 [poss. dollar amount]. RAMIREZ said that SMILEY was supposed to do it [deposit money] on the other one [bank account] because RAMIREZ would have too much [money] on that one [the "TiffanyB" account]. RAMIREZ said that it was alright. SMILEY said that he [SMILEY] had done it [deposited money into a SMILEY bank account] on the other one [different RAMIREZ bank account] last time. RAMIREZ answered in the negative and explained that he [SMILEY] had done it [deposited money] on this one [the "TiffanyB" account], too. SMILEY apologized. RAMIREZ acknowledged.

120. Surveillance agents observed RAMIREZ park his white Land Rover in front of the complex at 5501 Demarcus Boulevard, in Dublin, and exit the vehicle carrying a roll of gift wrapping paper. RAMIREZ carried the wrapping paper into the apartment building. A short time later, surveillance observed BROWN exit the complex, walk to her nearby maroon Mercedes Benz, and remove a large red cardboard box. BROWN carried the package back into the apartment complex. After approximately five minutes, surveillance observed BROWN walk out of the apartment building carrying a box of identical dimensions, now wrapped in gift wrapping paper. BROWN placed the wrapped package into the trunk of her vehicle before returning to the building.

121. Less than an hour later, surveillance observed RAMIREZ and BROWN walk out of the apartment building together. At this time, RAMIREZ was now carrying a second gift-wrapped package. The two walked to BROWN's maroon Mercedes Benz. Surveillance observed RAMIREZ place the box into the trunk of the vehicle and then remove the original box (which BROWN had earlier placed in the trunk) and place this additional gift-wrapped box on the rear seat of the vehicle. Surveillance then observed RAMIREZ walk to his white Range Rover and drive away from the complex. At the same time, BROWN drove away in the maroon Mercedes Benz.

122. Agents followed BROWN as she drove directly to a UPS Store in nearby Pleasanton. At this location, Det. Badour observed BROWN carry in the gift-wrapped package which had been on the backseat and she gave this to a clerk to ship to an address in New York. Det. Tribble approached the clerk and verified that BROWN had again provided a false name and shipping address. Det. Tribble took possession of this package.

123. Agents followed BROWN as she drove back to the apartment building on Demarcus Boulevard. There, she parked in front and entered. A short while later, a surveillance agent observed BROWN exit the apartment building, re-enter the Mercedes Benz, and drive directly to a different UPS Store in Pleasanton. There, the surveillance agent observed her remove the gift-wrapped package from the trunk and carry it into the store and give it to a clerk to be shipped to an address in Oklahoma. TFO Stevenson entered the store and verified with the clerk that BROWN had again provided a separate false name and shipping address and TFO Stevenson took possession of the package. That same day a narcotics detection canine subsequently alerted to the odor of narcotics emanating from both packages.

124. On August 27, 2010, I obtained a federal search warrant from the Honorable Judge Kimberley Mueller authorizing the search of both packages. Upon opening the package destined for New York, I located the gift-wrapped packaged containing a red cardboard box containing a VCR. Inside the VCR, which was hollowed-out, I located several pounds of marijuana. Inside the package destined for Oklahoma, I located the gift-wrapped package containing an identical red box containing an identical hollowed-out VCR which was found to contain six vacuum sealed packages containing what was believed to be between 6,000 and 7,000 suspected MDMA tablets of various color and bearing various images including Alien Head, Dolphin, James Bond 007 and golf ball imprints.

125. The DEA Western Regional Laboratory has finished analyzing approximately 3000 pills from this seizure and determined that these pills contain approximately 812 grams of a substance and mixture containing MDMA.

126. On August 27, 2010, RAMIREZ was intercepted engaging in calls with SMILEY and PAYTON during which they discussed the impending arrival of the packages (that I had seized). RAMIREZ revealed that he had access to a large amount of Promethyzene with Codeine Syrup which he offered to supply to both of them.

### August 31, 2010 - Phat NGUYEN Supplies RAMIREZ with 6000 MDMA Pills – Pills are Identified as "Red Playboys" and "Blue Dolphins"

127. On August 28, 2010, at approximately 12:50 p.m., RAMIREZ received an incoming intercepted call from Phat NGUYEN using (510) 705-2191. NGUYEN told RAMIREZ that he had fantastic news. NGUYEN said that he had "red playboys" and "blue dolphins." RAMIREZ said that was cool and added that he had been dealing with those but they had been trying to kick his head off. NGUYEN told RAMIREZ not to worry, that he would take care of him and asked how many RAMIREZ wanted so that NGUYEN could go and get them. RAMIREZ said that for sure he would need about "five" [5000 MDMA pills] in the

next few days. NGUYEN asked him what he wanted so that he could get the order now. RAMIREZ replied "just get three of each" and he'd get rid of them. NGUYEN acknowledged RAMIREZ's order.

128. On August 29, 2010, at approximately 8:32 p.m., RAMIREZ called NGUYEN. NGUYEN stated that he was waiting to go get the MDMA and RAMIREZ stated that he needed them as soon as possible and that NGUYEN should "snatch them" in case they went fast. NGUYEN stated he would obtain the MDMA but that he needed to give his source "the paper," [the money], back really fast. RAMIREZ stated that he had "a lot of shit out there right now." NGUYEN asked if RAMIREZ wanted "three and three" and RAMIREZ indicated he did. RAMIREZ stated that he was still waiting to see if his pills had been delivered in Oklahoma. I believe NGUYEN's reference to "three and three" is NGUYEN's offer to provide an initial 3000 MDMA pill load to RAMIREZ, followed by another 3000 MDMA pill load after RAMIREZ receives his money from the sale of the first 3000 pills.

129. On August 31, 2010, RAMIREZ was intercepted over **TARGET TELEPHONE 4** being contacted by Phat NGUYEN at approximately 2:45 p.m. During the intercepted call, NGUYEN indicated he could obtain the 6000 MDMA pills that day if RAMIREZ still wanted it. RAMIREZ indicated he did. That evening, RAMIREZ and NGUYEN exchanged a series of intercepted call during which RAMIREZ asked NGUYEN to obtain the MDMA pills that evening. RAMIREZ told NGUYEN he had the money for 5000 tablets and asked if NGUYEN would give him the 6000 pills with the understanding that RAMIREZ would pay him for the remaining 1000 pills within a few days. NGUYEN agreed to this arrangement and said he would go get "3 and 3," referring to 3000 of each type of pill (Red Playboy/Blue Dolphins). Surveillance subsequently followed NGUYEN from his residence to a location in Oakland where he was believed to have obtained the MDMA pills. Following this, NGUYEN called RAMIREZ and agreed to meet at RAMIREZ's residence at approximately 9:45 p.m., Surveillance subsequently followed NGUYEN and observed RAMIREZ meet with NGUYEN in in front of RAMIREZ's residence at which time NGUYEN provided RAMIREZ with a box inside of NGUYEN's vehicle which RAMIREZ carried back into the residence and which agents believe contained the 6000 MDMA pills.

130. The following day, September 1, 2010, RAMIREZ was intercepted over **TARGET TELEPHONE 4** informing SMILEY in Oklahoma that he had "six," but, in light of the August 27, 2010 seizure of pills, RAMIREZ was going to send "three first" and the remainder of the pills, only if the first three arrived in Oklahoma. RAMIREZ told SMILEY to put money in a bank account before he would send the pills the next day. RAMIREZ also told SMILEY that he was going to be getting a new telephone.

## September 2, 2010 – RAMIREZ Intercepted Sending Thousands of MDMA Pills to Oklahoma Through UPS

131. On September 2, 2010, agents again conducted surveillance of RAMIREZ at 5501 Demarcus Boulevard, in Dublin. At this time, agents observed RAMIREZ exit the apartment complex, enter his white Range Rover, and drive to a nearby Wal-Mart. At the Wal-Mart, surveillance observed him purchase a tube of gift-wrapping paper and take it directly back to the

apartment complex. Less than an hour later, TFO Stevenson observed RAMIREZ exit the apartment complex carrying a short, rectangular cardboard shipping box which he placed in the rear of the vehicle.

132. RAMIREZ was then observed traveling to a **Metro PCS** Store in Dublin. It should be noted that as of September 2, 2010, there was no subsequent contact with SMILEY over **TARGET TELEPHONE 4** and there was a noticeable reduction in outgoing calls made by RAMIREZ. This, in my experience, is indicative of a drug trafficker obtaining a new telephone. After RAMIREZ left the Metro PCS Store, agents followed RAMIREZ to San Francisco. There, they observed him park downtown in close proximity to the U.S. Post Office. Agents temporarily lost sight of him between 1:10 p.m. and 1:50 p.m. until surveillance re-acquired his vehicle. I subsequently learned that there was a U.S. Post Office in the general area where RAMIREZ's vehicle had been shown located during this time.

133. I subsequently contacted the US Postal Inspectors who were able to identify a package which fit the dimensions of the package RAMIREZ was observed carrying out to his vehicle which was overnight shipped from the U.S. Post Office in downtown San Francisco to an address in Oklahoma City. I later learned this address is the residence of Michael SMILEY's aunt.

134. I subsequently contacted U.S. Postal Inspector Al Sharpe of Oklahoma and learned that at approximately 1:22 p.m. on September 2, 2010, a U.S. Postal Express Mail package had been shipped overnight from downtown San Francisco to an address in Oklahoma City. Inspector Sharpe related that a narcotics detection canine alerted to the odor or narcotics emanating from the package. Inspector Sharpe subsequently obtained a federal search warrant for this package and located approximately three clear plastic heat sealed tubes which contained approximately 3,000 suspected MDMA pills. These tablets were red Playboy bunny imprint and blue Dolphin imprint tablets. These pills matched the description of the pills that NGUYEN said he would supply to RAMIREZ during intercepted calls on August 31, 2010.

135. The DEA Western Regional Laboratory subsequently analyzed these tablets and determined they contained approximately 1079 grams of a substance and mixture containing MDMA and Benzylpiperazine (BZP).

136. Inspector Sharpe confirmed that the dimensions and color of the U.S. Postal shipping box were identical to those of the package that TFO Stevenson had observed RAMIREZ placing in the back of his vehicle on September 2, 2010, before driving to the area in downtown San Francisco where the U.S. Post Office was located from which this package had been shipped.

### September 3, 2010 – Tiffany BROWN Stopped in Vallejo with 3,000 MDMA Pills Delivered to Her by RAMIREZ

137. On September 3, 2010, RAMIREZ was intercepted over **TARGET TELEPHONE 4** discussing with Marcus DAVIS whether he should send the remaining 3000 MDMA pills. RAMIREZ told DAVIS that he had called and confirmed with the U.S. Postal Service that the package from the previous day had made it's way to Oklahoma and was en route for

delivery, although it had still not yet been delivered. DAVIS told RAMIREZ that packages he (DAVIS) had shipped within the last few days had made it and assured RAMIREZ that everything was fine.

138. RAMIREZ, who was in Vallejo at that time, was then intercepted contacting his girlfriend, Tiffany BROWN, and instructing her to get the bag in their residence which contained "the little things" as well as the bubble wrap, heat sealer, etc., and to bring all those items to him in Vallejo.

139. Surveillance subsequently observed BROWN carry out a Gucci bag which RAMIREZ had described over the telephone out to her vehicle, place it in the trunk and then drive to Vallejo. Previous inquiries with the DMV had revealed that BROWN was driving on a suspended license and a vehicle code stop was arranged while she was driving through Vallejo. BROWN was cited and released and her vehicle was towed. A Vallejo PD Officer inventoried the vehicle prior to towing and located the open Gucci Shopping Bag in the trunk which contained approximately 3000 suspected MDMA tablets identical to the Red Playboy and Blue Dolphin tablets seized in Oklahoma, as well as the heat sealer, bubble wrap and tape described by RAMIREZ.

140. The DEA Western Regional Laboratory subsequently analyzed these tablets and determined they contained 985.9 grams of a substance and mixture containing 3-4 Methylenedioxymethamphetamine (MDMA) and Benzylpiperazine (BZP).

141. On September 4, 2010, there was only one intercepted call over **TARGET TELEPHONE 4.** This was a call by RAMIREZ to DAVIS at the phone subscribed in the name of Al Pacino's "Scarface" character, "Tony Montana." During this intercepted call, RAMIREZ and DAVIS discuss RAMIREZ's hope that his package made it [to Oklahoma].

142. On September 5, 2010, there was only one intercepted call over **TARGET TELEPHONE 4** which was an accepted incoming call from DAVIS from the "Tony Montana" telephone. During this call, DAVIS told RAMIREZ that he had just talked to an individual they apparently mutually knew and that he had told DAVIS to "count them up" and that he was going to "swap them out" for him. I noted that DAVIS had previously been intercepted discussing with RAMIREZ that the quality of some of the pills he had obtained from the Asian source had been quite bad. During the September 5, 2010 intercepted call, DAVIS told RAMIREZ that he would meet with him on September 7, 2010, after he obtained the new pills so RAMIREZ could "add them up." This was the last monitored call over **TARGET TELEPHONE 4**.

### September 7, 2010 - Seizure of 11,000 MDMA Pills from Marcus DAVIS at His Vallejo Residence

143. On September 7, 2010, Vallejo Police executed a state search warrant at Marcus DAVIS's residence at 601 Mark Avenue in Vallejo. Inside, officers located Marcus DAVIS sleeping on a couch with a loaded firearm under the cushion. Officers also located Anthony YOUNG

sleeping in a room inside the residence. YOUNG identified himself as DAVIS's cousin.
While searching the residence, officers seized several cellular telephones each from both
DAVIS and YOUNG, including the telephones that DAVIS and YOUNG had been
intercepted over having contact with RAMIREZ. DAVIS admitted that there were MDMA
pills inside the residence. During a search of the residence, officers located approximately
11,000 MDMA pills. DAVIS was arrested on state narcotics charges and booked into Solano
County Jail. DAVIS was released a short time later because no charges have been filed at
this time by the Solano County District Attorney's Office. This MDMA weighed over 3
kilograms gross weight and was submitted to the Western Regional Laboratory. Although
this MDMA has not been analyzed to date but a presumptive test of the pills returned a
positive result for the presence of MDMA.

144. The pen register on RAMIREZ's telephone indicated that on September 7, 2010, following
DAVIS's arrest, DUONG attempted to contact RAMIREZ, although RAMIREZ was no
longer answering this telephone.

145. I subsequently examined the tolls for DUONG's telephone collected per the court authorized
pen register order. I learned that between July 11, 2010, and September 7, 2010, there were
270 calls between DUONG'S telephone and cellular telephone (510) 258-5106 subscribed in
the name of "Tony Montana," the same subscriber name as DAVIS's seized telephone at the
time of his September 7, 2010, arrest, and this number was one of the highest frequency
contacts for DUONG's telephone during that period, the last call occurring on September 7,
2010, the day of DAVIS's arrest. I also noted the initiation of contact between only one other
separate Northern California area-code cellular phone (a pre-paid no-name cellular
telephone) and DUONG's telephone during the month of September 2010 occurred
immediately following DAVIS's arrest and I believe based upon the timing of the initiation
of this telephone and the high-frequency of ongoing contact that this is the telephone DAVIS
obtained to replace the seized the "Tony Montana" telephone after being released. I believed
DUONG was the individual whom DAVIS told RAMIREZ that he had just talked to and the
Asian MDMA source of supply the both mutually knew during the intercepted call on
September 5, 2010.

## February of 2011 – RAMIREZ Relocates to the Sacramento Area – Marcus DAVIS Arrested for Murder in Natomas

146. I subsequently learned that beginning in February of 2011, various data base inquiries
revealed RAMIREZ listing a new address of 500 Candela Circle, Sacramento, California.
Specifically, credit header databases indicated that cable service was initiated in RAMIREZ's
name using his social security number at 500 Candela Circle, Sacramento, California as of
February 7, 2011.

147. During the early morning hours of February 20, 2011, 27-year-old Chester Jackson was shot
and killed in a parking lot outside of an IHOP restaurant in Sacramento County, California.
Sacramento Police quickly identified Marcus DAVIS as a suspect in the murder.

148. On February 24, 2011, Sacramento Police announced that Marcus DAVIS and another associate had turned themselves in. DAVIS has been detained in Sacramento County pending the murder charge since that time.

### April 2011 Search Warrant at RAMIREZ's Sacramento, California Residence –– RAMIREZ and BROWN Arrested and Indicted

149. On April 15, 2011, I executed a federal search warrant for RAMIREZ's Sacramento residence and located both RAMIREZ and BROWN present at the time of the warrant's execution. They were both arrested. During a search of the residence, I located additional Express Mail Package Receipts indicating that multiple packages had been sent from American Canyon and Vallejo to Georgia utilizing false names during February of 2011. I noted that the handwriting on the Express Mail Receipts appeared to be made by the same female and that the names (**Mya** CROSBY/**Michelle** COY) appeared very similar to the names (**Mya** TATE/**Michelle** KELLEY) utilized by Tiffany BROWN to ship packages observed and seized by agents during prior surveillance operations in 2010, which agents confirmed contained MDMA and marijuana.

150. On April 28, 2011, a Sacramento grand jury returned a two-count drug trafficking Indictment against RAMIREZ and BROWN in the Eastern District of California. The Indictment in United States v. Ramirez, et al., Case No. 2:11-cr-00190 MCE, charges them with conspiracy to distribute and possess with intent to distribute MDMA and possession with intent to distribute MDMA (arising out of the September 3, 2010 seizure of MDMA pills from BROWN's Mercedes in Vallejo). Both defendants obtained release orders and the Indictment remains pending at this time.

**RAMIREZ Distributes Marijuana to Manuel "Manny" KEITH in New York –**
**RAMIREZ Obtained the Marijuana from Justin NONOGUCHI in California**

151. Prior to the initiation of wire interception over **TARGET TELEPHONE 3**, it was noted that between April 7, 2010 and June 24, 2010, **TARGET TELEPHONE 3** was in contact 109 times with the number (917) 559-5198 with the last call occurring on or about June 23, 2010.

152. The number (917) 559-5198 is a phone subscribed in the name of Manuel KEITH with a listed subscriber address of 6915 Kissena Blvd. Apt. 2C, New York, New York.

153. Inquiries with NCIC revealed that KEITH was arrested on September 2, 2009, in New York for Possession of Marijuana and Criminal Sales of Marijuana. No Adjudication was available.

154. KEITH was identified during a recent suspected drug money seizure investigation conducted by the San Francisco DEA in 2009. On December 29, 2009, a narcotics detection canine at the San Francisco Fed Ex Airport facility alerted to the odor of narcotics emanating from a package being shipped from New York to "Manny KEITH" at an address in San Francisco and with a contact number of (917) 559-5198. This is the same cellular telephone number as that which was in high-frequency contact with RAMIREZ over **TARGET TELEPHONE 3**. After obtaining a San Mateo County search warrant agents opened the package and located a Gucci bag containing 17 bundles of U.S. currency totaling $24,460. Agents then proceeded to the San Francisco address that the package was being shipped to and contacted the four occupants, including Manuel "Manny" KEITH. KEITH claimed he was a barber from New York who was visiting friends in California and admitted that he had been expecting a package from the listed sender but had no idea that there would be any money in it. Agents contacted the sender who first denied knowing KEITH or sending the package or knowing about and large amounts of money, but later stated that he did know KEITH and had sent the money for KEITH to purchase a vehicle. Based upon the totality of the circumstances, this currency was seized and forfeiture proceedings were initiated.

155. On August 10, 2010, agents intercepted RAMIREZ over **TARGET TELEPHONE 3** making an outgoing call to the Atlanta area code telephone subscribed to Frank ALIOTO. During the intercepted call, ALIOTO told RAMIREZ he had been in New York. RAMIREZ told ALIOTO that he might travel to New York the following week and wanted to know if ALIOTO was going to be there. ALIOTO told RAMIREZ that "it's all good." ALIOTO also said he was supposed to go back to Atlanta.

156. Following this call and on the same day, agents intercepted RAMIREZ over his second phone, **TARGET TELEPHONE 2**, engaging in calls with his suspected MDMA suppliers and his marijuana supplier, an individual subsequently identified through surveillance as Justin NONOGUCHI, utilizing telephone (415) 747-6356. During calls on this day, RAMIREZ and NONOGUCHI discussed prices for pounds of marijuana. NONOGUCHI said the best quality pounds were $3250 each. RAMIREZ indicated he would probably only obtain four of the pounds that cost that much. RAMIREZ and NONOGUCHI agreed to meet

the following day and, based upon subsequent intercepted calls, apparently met and consummated this transaction on August 11, 2010.

157. As described above, on Thursday August 12, 2010, agents conducted surveillance of RAMIREZ and his girlfriend, Tiffany BROWN, during which agents observed RAMIREZ giving BROWN two large gift-wrapped packages in a public parking lot. BROWN placed the packages into her maroon Mercedes Benz and drove away. Agents followed BROWN from Dublin as she drove to Foster City, California. In Foster City, agents observed BROWN travel to two different UPS Stores where she was observed carrying in and mailing packages utilizing false names. While BROWN was en route to mail these packages, RAMIREZ was intercepted informing her that he was texting BROWN the shipping information he had received for the "New York" package. One of these packages was sent to Oklahoma City and was believed to be a shipment of MDMA to SMILEY which RAMIREZ had obtained on August 11, 2010, from Ung DUONG. Vallejo PD Detective Bill Badour contacted the store manager at one UPS location and learned that the second package, which BROWN dropped off just prior to the store closing, weighed **14 pounds** and was shipped to **Myra Kelley, 17612 Kildare Rd, Jamaica New York 11432**. The shipping information denoted that the package was to be dropped on the porch at this address.

158. I confirmed that this package did not make it onto the overnight shipment prior to the weekend cut-off and that the package which was mailed to New York arrived and was delivered on Monday August 16, 2010 by UPS. On this same date, RAMIREZ placed an intercepted call to KEITH over **TARGET TELEHONE 3**. KEITH immediately said, "It's good." RAMIREZ asked "Two thumbs up?" to which KEITH said yes. RAMIREZ asked if everything was great, and KEITH again confirmed. KEITH said to RAMIREZ that he had told him not to be nervous, and asked RAMIREZ, "What's up with the next one?" KEITH asked if RAMIREZ was about "to do it." RAMIREZ told KEITH that he would "hit him up from the other joint later on." I believe this call was KEITH confirming with RAMIREZ that KEITH had received the shipment of drugs which had been delayed over the weekend and then KEITH inquired about the next shipment of drugs that RAMIREZ would send.

159. Later that same day, RAMIREZ placed a call to KEITH during which he asked KEITH what was up for the weekend. KEITH stated that, "I am about to get this out," but that he wanted to go to a particular location two hours away "because Atlanta is just right there, close." RAMIREZ indicated he was going to Atlanta. RAMIREZ told KEITH to let him know so that he could get what he needed to get together. RAMIREZ reiterated that he needed to know so that he could get the line on the third thing, get the line together. KEITH said "yeah, yeah, yeah, I know what you are saying." RAMIREZ said he was just trying to get it lined up, whether it is your way or that way, I am just trying to make sure. KEITH said he would find out what these guys want to do right now and that he was about to "tote the pack right now."

160. Following these calls with KEITH on August 16, 2010, RAMIREZ was intercepted having repeated calls with NONOGUCHI during which the discussed meeting later in the day for RAMIREZ to obtain several pounds of different quality marijuana from him. RAMIREZ told NONOGUCHI he wanted two pounds of the "super dark" and two pounds of the "lighter."

NONOGUCHI said the "super darks" were $3,300 per pound. Surveillance followed RAMIREZ from Vallejo. Agents watched RAMIREZ meeting with NONOGUCHI in Richmond, California. During the meeting, RAMIREZ was observed getting into NONOGUCHI's vehicle in a public parking lot near a marijuana dispensary for a short period of time. I believe RAMIREZ purchased marijuana from NONOGUCHI during this meeting on August 16, 2010. Following this drug deal, surveillance followed NONOGUCHI to the nearby medical marijuana dispensary and took photographs of NONOGUCHI at this location.

**RAMIREZ Travels for Drug-Related Business to Atlanta and Meets Frank ALIOTO and Then Travels to New York to Meet Manny KEITH**

161. During intercepted calls on August 17 and 18, 2010, RAMIREZ spoke to individuals using phones with New York and Georgia area code numbers. During these intercepted conversations, RAMIREZ discussed the fact that he was going to fly to Atlanta and then to New York in the next few days. During one such intercepted call with an individual using a Georgia area-code, RAMIREZ said he would have to "see what was up with the load" and would be extra busy. RAMIREZ said he wouldn't have time to visit with this person while he was in Georgia.

162. On August 18, 2010, agents intercepted RAMIREZ receiving an incoming telephone call from the Atlanta area-code telephone subscribed in Frank ALIOTO's name, number (404) 769-2222. During this intercepted call, ALIOTO claimed he had obtained a ticket and was planning on flying out. RAMIREZ said he did not believe ALIOTO. Later in the conversation, ALIOTO asked RAMIREZ for a "four piece qualified." RAMIREZ told ALIOTO that he had to take care of something and would come back to ALIOTO in a minute. I believe this reference by ALIOTO to a "four piece qualified" refers to either four-thousand tablets of MDMA or four pounds of marijuana or some combination of both drugs.

163. On August 20, 2010, agents intercepted RAMIREZ making an outgoing telephone call to the Atlanta area-code telephone subscribed in ALIOTO's name, number (404) 769-2222. During this intercepted call, RAMIREZ told ALIOTO that he was flying to Atlanta that evening. Due to technical problems, this call was dropped. Other calls intercepted between RAMIREZ and others during this same time period indicated that RAMIREZ did in fact purchase an airline ticket and traveled to Atlanta that day.

164. On August 21, 2010, the last day of intercepts over **TARGET TELEPHONE 3**, agents intercepted RAMIREZ contacting KEITH and advising KEITH that RAMIREZ was about to fly on Delta from Atlanta to New York that day. KEITH said he would be there to pick him up. During subsequent intercepts calls over **TARGET TELEPHONE 2**, agents determined that RAMIREZ returned to California on August 23, 2010.

165. According to telephone toll records, RAMIREZ continued to have contact with KEITH and ALIOTO's telephones over RAMIREZ's **TARGET TELEPHONE 3**.

## August 25, 2010 - RAMIREZ Obtains Marijuana from NONOGUCHI

166. Between August 17 and August 25, 2010, RAMIREZ and NONONGUCHI exchanged more than ten intercepted drug-related calls. During the intercepted calls, RAMIREZ discussed obtaining multiple pound quantities of marijuana from NONOGUCHI. NONOGUCHI quoted prices of between $2,600 and $3,300 per pound for various qualities of marijuana. RAMIREZ indicated he had to obtain marijuana for various customers and, according to the intercepted calls, met with NONOGUCHI on at least one occasion to obtain three to four pounds. On August 25, 2010, RAMIREZ arranged to meet with NONOGUCHI to obtain some marijuana which NONOGUCHI described as "80% black" for $3,200 per pound.

167. As described above, agents intercepted RAMIREZ speaking with SMILEY on August 26, 2010. During that intercepted call, RAMIREZ indicated he was sending the drugs he had requested that day. On this same day, RAMIREZ was intercepted instructing Tiffany BROWN to deliver two packages and agents surveilled BROWN transport two gift-wrapped packages from their residence to nearby UPS Stores where these packages were shipped. One package was again shipped to Oklahoma and this package was seized and during a subsequent search warrant found to contain approximately 2 kilograms gross weight of pills subsequently analyzed as containing MDMA. The second package was shipped to **Michelle Kelley, 10415 Avon Road, Jamaica, New York 11432**. During a subsequent search warrant executed on this package, it was found to contain 1056 grams of Marijuana (analyzed by the DEA Western Regional Laboratory) concealed within an electronic device.

168. RAMIREZ and NONGUCHI continued to engage in numerous intercepted calls over **TARGET TELEPHONE 4** from the time of the interception of the packages on August 26, 2010, through until the termination of interception of communication over **TARGET TELEPHONE 4** on September 7, 2010. My review of each of these intercepted calls between RAMIREZ and NONGUCHI leads me to believe they are frequently discussing prices and arrangements to conduct marijuana transactions, and the consummation of additional drug deals. At one point, when RAMIREZ was having difficulty obtaining MDMA, RAMIREZ asked NONOGUCHI if he "had a line on the little people," which was terminology RAMIREZ had utilized with other traffickers when discussing MDMA pills ("little people"). NONOGUCHI said he would find out for RAMIREZ and talk to his people.

169. On September 2, 2010, during the early morning hours, Task Force Agents of the DEA San Francisco International Airport Narcotics Task Force were working parcel interdiction at the Federal Express Facility in San Francisco. Agents located a Fed Ex Parcel with Tracking Number 8728 3463 3536 that weighed 15 pounds and which bore a handwritten shipping label. The air bill listed the sender as **Frank ALIOTO**, 201 Park Avenue South, New York, NY 10003. On the state information line, the sender had written "GA," then lined it out and wrote "NY." The air bill listed the following information as the recipient: **John ALIOTO, Searano Hotel, Address: 405 Taylor Street, San Francisco, CA 94102.**

170. I subsequently noted that John ALIOTO is **Frank Joseph ALIOTO's** known moniker with the California DMV. This parcel was sent on the evening of September 1, 2010, with requested Express Priority Overnight Delivery. It was paid for in New York at a cost of $129.16. The cost of shipping was paid in cash. A narcotics detection canine alerted to the odor of narcotics emanating from the package.

171. Task Force Officers obtained a federal search warrant for this package. Upon opening this package, agents located $104,770.00 in U.S. currency.

172. I believe this currency represented drug proceeds owed by ALIOTO to RAMIREZ for drugs previously provided by RAMIREZ to ALIOTO on credit and shipped by RAMIREZ to ALIOTO through the U.S. mails. These drugs were likely the topics being discussed by RAMIREZ and ALIOTO during the intercepted calls in August of 2010 and RAMIREZ's subsequent travels to Atlanta and New York. It is worth noting the unusual nature of legitimate commerce to be conducted by shipping an enormous amount of currency through the mails. If the payment was for legitimate commerce, safer payment methods include credit card payments, depositing or transferring the money through a bank (however, this amount of currency would trigger mandatory bank reporting requirements), or simply mailing a check. The observed movements and actions of RAMIREZ on this same day further corroborate my theory that RAMIREZ and ALIOTO were engaged in an ongoing criminal conspiracy to distribute and possess with intent to distribute MDMA and marijuana using the United States postal system.

173. As detailed above, U.S. Postal Inspector Al Sharpe of Oklahoma seized and searched a U.S. Postal Express Mail package that had been shipped overnight from downtown San Francisco to an address in Oklahoma City. The package contained three clear plastic heat sealed tubes which contained approximately 3,000 suspected MDMA pills. These tablets were red Playboy bunny imprint and blue Dolphin imprint tablets.

174. Inspector Sharpe confirmed that the dimensions and color of the U.S. Postal shipping box were identical to those of the package that DEA Task Force Officer Stevenson had observed RAMIREZ placing in the back of his vehicle on September 2, 2010, before driving to the area in downtown San Francisco.

**Conclusion**

Count One: **Nicholas RAMIREZ, Ung DUONG, Phat NGUYEN, Marcus DAVIS, Tiffany BROWN, Andre CAWTHORNE, Michael SMILEY, and Anthony PAYTON** – participating in a criminal conspiracy to distribute and possess with intent to distribute MDMA, a Schedule I Controlled Substance, between approximately July 1, 2008, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Count Two: **Nicholas RAMIREZ and Marcus DAVIS** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about March 25, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Three: **Nicholas RAMIREZ, Marcus DAVIS,** and **Andre CAWTHORNE** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about August 16, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Four: **Marcus DAVIS** and **Anthony YOUNG** – possession with intent to distribute a mixture and substance containing a detectable amount of MDMA, a Schedule I Controlled Substance, on or about September 7, 2010, in violation of 21 U.S.C. § 841(a)(1).

Count Five: **Nicholas RAMIREZ, Justin NONOGUCHI,** and **Manuel KEITH** - participating in a criminal conspiracy to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of marijuana, a Schedule I Controlled Substance, between approximately March 1, 2009, and the present, all in violation of 21 U.S.C. §§ 846 and 841(a)(1).

Count Six: **Justin NONOGUCHI** – using a communication facility to facilitate a drug trafficking crime, specifically, using the telephone assigned number (415) 747-6356 to facilitate the crime of conspiracy to distribute and possess with intent to distribute marijuana, during an intercepted call with Nicholas RAMIREZ, on or about August 16, 2010, all in violation of 21 U.S.C. § 843(b).

I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

Brian Nehring, Special Agent
Drug Enforcement Administration

Sworn to and subscribed before
me on the __16th__ day of April, 2012

**GREGORY G HOLLOWS**
Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

Jason Hitt
Assistant U.S. Attorney